# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed December 24, 1927.

PHILADELPHIA, BALTIMORE AND WASHINGTON RAILROAD, A CORPORATION, PLAINTIFF,

VS.

HAROLD E. WEST, J. FRANK HARPER AND STEUART PURCELL, THE PERSONS CONSTITUTING THE PUBLIC SERVICE COMMISSION OF MARYLAND, DEFENDANTS.

*William Pepper Constable* and *William L. Marbury, Jr.,* for complainants.
*Raymond S. Williams* for defendants.

STANTON, J.—

This bill of complaint alleges that the order of the Public Service Commission complained about is unlawful and unreasonable and prays, among other things, that the proviso attached by said Commission to its approval of the application of the railroad for the relocation of its lines between a point 2,000 feet south of Port Deposit Station, Cecil County, Maryland, to a point beyond the Maryland and Pennsylvania State line, be declared null and void; and also that this cause be remanded to the Commission with directions to approve the application of the railroad for the proposed relocation of its lines without attaching to said approval any proviso attempting to prescribe any increase in the grade of 0.35 per cent between a point 2,000 feet south of Port Deposit Station, in Cecil County, Maryland, and the Maryland and Pennsylvania State line.

The residents of the town of Port Deposit, in Cecil County, Maryland, protested against the approval of the plans for relocating the tracks of the railroad company (which has always run through the town limits along the bank of the river), because of the elevation of the roadbed occasioned by the change in the grade from that as it now exists as the level for the roadbed where it runs through the town. The complaint of the town is that if the railroad is permitted to construct on a grade of 0.35 per cent., such grade will occasion an embankment of about fifteen feet at the place where the railroad enters the upper portion or north-end of the town, and gradually lessen as it goes towards Port Deposit Station until it reaches at or near its present level. Further that this fifteen-foot embankment will shut off light, air and a view of the river. And that as the houses on the east side of the main street are built on the side of a hill it will place the main street of the town in a gulch, makng a sluiceway for storm water, and a dangerous situation in the event of flood from ice gorges in the river, which have in the past occasionally occurred at this point. The Public Service Commission has ordered a grade of 0.38 per cent., which means an embankment of about six feet in the upper portion of the town instead of one of fifteen feet.

It is difficult to say how much, if any, of the anticipated trouble or damage will be avoided by an embankment of six feet, as against one of fifteen feet. An embankment of six feet is still a sluiceway and trouble from floods occasioned by ice gorges, and overflow from the river, or any other source, is as likely to do as much damage as will result from a higher embankment. So that little or no relief to the town in this respect is afforded by the change from 0.35 per cent. to 0.38 per cent. If the railroad is subject to the order of the Public Service Commission so as to be required, to change a proposed grade in original construction, or in relocating its tracks; then there is little room for doubt that the railroad has proceeded with utter disregard of the rights of the town, and in seeming defiance of the authority of the Public Service Commission. The facts certainly justify such a conclusion, because some one acting for the railroad company, or the Philadelphia Electric Company, which, for the purposes of this case, are one and the same, met the town people in open meeting in October of 1926. This representative submitted plans substantially the same as the ones on which the construction is being carried out, and because the town authorities would not approve them, nothing further was done in consulting with the town people, nor were the plans submitted for the approval of the Public Service Commission before the work was begun, and not until the work was well under way, and an expensive bridge built (which is said to have cost $500,000) did the railroad company go to the duly constituted body for the approval of their plans, and authority to proceed with the work. It would seem that the Public Service Commission took into account this situation as it existed when the matter was submitted to the Commission, and attempted to adjust the grade to the then existing conditions. The result is that neither the railroad company nor the town of Port Deposit is satisfied, and both have appealed from the order of the Commission. The only thing that will entirely satisfy the railroad would be to continue the old grade of 0.30 per cent.; and as to the town authorities—to continue the roadbed at its present level. That would run the railroad substantially on its present lines with practically no embankment, and thus satisfy the town people, and at the same time it would continue the much desired 0.30 per cent. grade,

which the railroad insists is the most economical for efficient service. This was the situation that was contemplated and provided for in the agreement entered into by the Philadelphia Electric Company (which will hereafter be called the Power Company) and the railroad back in 1906, when the location of the Conowingo Dam was contemplated at a point a full mile or more up the river from where it was subsequently built. This change in the location of the dam has necessitated a change in the contemplated grade of 0.30 per cent., and for the benefit and interest of the Power Company, and without any regard to the interests of the town people or any consultation with the town authorities, the terms of the contract were changed in June of 1926, and instead of a grade of 0.30 per cent. the railroad accepted a grade of 0.35 per cent. If negotiations had continued with the town authorities, the original status might have been preserved. So that if the matter of the grade is confided to the Public Service Commission, the railroad is in no position to complain if the appeal of the town of Port Deposit is sustained, and a grade of 0.40 per cent. is required, or a regrading of the roadbed, and the lowering of the bridge at Octarora, so as to substantially maintain the present level of the track.

The residents of the upper portion of the town, and the town authorities contend that the owners of property in that section of the town will be substantially damaged by allowing the railroad to enter the town from the upper end on a fifteen-foot embankment, and this factor was strongly urged on the attention of the Public Service Commission, as well as on the Court in the argument presented. But if there is any damage to property owners by reason of the elevation of the roadbed, and the tracks of the railroad, that is a matter which must be dealt with by the remedies now provided in the law, and is not a subject committed to the Public Service Commission for protection.

In the case of the Thunder Limestone Co. vs. Detroit & Michigan Railway Co., 294 Fed. 958, among other things the Court in that opinion said "In the construction of a railroad between two given points, it is inevitable that some land owner will be more or less damaged and inconvenienced. No railroad could be constructed which would pass over (and to interpolate—or in front of) every owner's land to his entire satisfaction; but adequate provision is made in the condemnation laws to recompense the owner for such damage." And so in the laws of this State. Any damage which the individual property owner might sustain is a subject for inquiry and protection in some proceeding, other than before the Public Service Commission. To like effect is the case of Milwaukee E. R. & L. Co. vs. Milwaukee County, 189 Wis., page 896. The Commission approved the application to construct a branch line, and one Commissioner dissenting on the ground that the Commission had refused to consider evidence offered to show that the railroad, if built upon the proposed location, would destroy residential property of considerable value, and would disrupt a plan of municipal and county zoning in the entire community which it traversed. The dissenting Commissioner considered that the application should have been approved upon modification of the proposed route, whereas the majority of the Commissioners took the view that the protection of private property and of municipal and county zoning plans was not committed to their charge. On appeal to the Court it was held that the majority of the Commission had been right in their views, and that the Commission had no power to modify the right of the proposed construction in order to avoid injury to a scheme of municipal and county zoning. In the course of its opinion, the Court said (pages 99 to 102): Under the law applicable, it is within the province of the Railroad Commission to consider the rights and interests of the people affected by the proposed routes, including the subject of zoning and park planning, proposed by Milwaukee County; or is the Commission limited in its consideration to the public that are or will be directly interested in the subject of transportation. * * * We think that (the later) is the construction to be given to our act. At the time the act was passed there were no zoning or planning laws on our statutes, and that such had received little or no consideration at that time. The rights of the individual owners of land affected by railroad construction were deemed to be adequately compensated under condemnation proceedings. It is true that the statute provides that

'If said proposed railroad is not a necessity or is not required by public convenience, either because already existing railroads or other means of transportation adequately provide for the necessities and requirements of the public, or for any other reason, then said Railroad Commission shall refuse to grant such certificate.' But it is clear that the phrase 'for any other reason' related back to the phrase that the said railroad is not a necessity, and is not required by public convenience. The necessity and convenience contemplated by the statute have reference to transportation and the public interests therein. Manifestly inconvenience of individuals along the proposed right-of-way could not affect the general subject of convenience and necessity for transportation facilities for the general public, and the Commission is not authorized to deny a certificate where the convenience and the necessity of transportation exists in the interest of the public. This being so, the evidence as to zoning, county planning and other similar matters were immaterial and the Commission was not required to consider it.' So that applying these principles it would appear that any inconvenience or property damage to individual owners of residences in the upper end of the town is a matter not contemplated by the Public Service Law, nor is any power conferred upon the Commission to deal with such a subject. Section 206. Art. 23, reads as follows:

"Whenever any railroad company heretofore incorporated, or which may hereafter be incorporated, shall find it necessary for the purpose of avoiding annoyance to public travel, or dangerous or difficult curves or grades, or unsafe or unsubstantial grounds or foundations, or for other reasonable causes, to change the location or grade of any portion of its road, whether heretofore made or hereafter to be made, *such railroad company shall be, and is hereby authorized to make such changes of grade and location*, not departing from the general route prescribed in the certificate of such company. * * *"

This Section was in the railroad law prior to the passage of the Public Service Commission law and any damage resulting from the exercise by the railroads of the rights thereunder was provided for and safeguarded; nor is this protection any less potent today.

Before the creation of the Public Service Commission in 1910, the power to determine the relocation of its lines, and the standard of the grades, was definitely committed to the management of the Railroad Company, and the question to be considered as decisive of this case is—Has the power to determine the grade confided to the management of the railroad been restricted by the Public Service Commission law?

Article 23, Section 379, reads in part:

"No common carrier, railroad corporation or street railroad corporation shall begin the construction of a railroad or street railroad, or any extension thereof, *or exercise any franchise or right under any provision of the railroad law*, or of any other law not heretofore lawfully exercised, without first having obtained the permission and approval of the Commission. The Commission shall have power to grant the permission and approval herein specified whenever it shall, after due hearing, determine that such construction or such exercise of the franchise or privilege *is necessary or convenient for the public service*." * * * etc.

The relocation of the tracks, and the change of the grade is the exercise of a "right under any provision of the railroad law." Whenever the exercise of that right is necessary or convenient for the public service, then the approval of that relocation or grade is a matter of right to the railroad. Otherwise, the details of construction which might enter into a railroad system covering many States and which, under Section 206, is confided to the railroad management, would be disrupted or set aside without any express authority so to do, in the Public Service Commission law. For the Public Service Commission to assume jurisdiction of such detail would be an unreasonable interference with the exclusive powers of the railroad management.

There is only one case in Maryland in which the words "*is necessary and convenient for the public service*" have attempted to be defined, but I can see nothing in the definition to apply to the facts of this case or which can aid in its determination.

Benson vs. Public Service Commission, 141 Md. 403.

But, say the defendants, certain powers are inferred because of the object to be attained, and the broad language

of Section 379 of Art. 23, which requires the approval of the Public Service Commission. And the application of this construction was the ground on which the power was conferred on the Public Service Commission to say whether a railroad should cross a public highway at, above or below the grade of the highway; although no express power to control grade crossings was set forth in Section 379.

It is readily seen that the necessity and convenience of the public service was directly involved in the grade crossing cases, both in the protection of vehicular travel and pedestrians on the highway, and the safety of the traveling public on the railroad. Above or below grade permitted the maintenance of greater speed, which is an important element in public service and in the operation of a railroad, and the prevention of many accidents to persons and property.

Some jurisdictions have declared grade crossings by a railroad to be a public nuisance.

Cowles vs. N. Y., N. H. & H. R. Co., 66 Atl. 1020.

But there is no such issue in this case. The crossing of the public highway by this railroad is some distance north of the town, and is above grade. So that this case resolves itself into the question of what is *the public service* to be taken into account in dealing with a change of grade in a railroad, and the only answer is, under the facts of this case, that it is that public service which is afforded by the railroad, either in passenger travel or freight shipments. Public service as used in Section 379 should not be construed to mean public interests of every character, so as to cover local conditions in Port Deposit, and take into account possible damage to private property.

People ex rel., etc., vs. Willcox, 200 N. Y. 423.

Under the evidence in this record, the grounds of objection are largely problematical. The objection that the embankment will shut off the air and light has little or no substance, because there is a public highway thirty feet wide in front of the residences in the upper end of the town. And between the western side of the highway, and the eastern side of the railroad tracks is unimproved land of considerable width, which is owned by the railroad,

and could be used for the erection of buildings. Such use of the land would in fact obstruct the view of the river and the air from that direction.

As to the fear from water which might accumulate on the surface of the main street through the town, drainage openings under the embankment would easily take care of any normal surface water, and if numerous enough, any abnormal conditions. But the probable unsightliness of the embankment is the real matter for protest, because all other annoyances from the operation of the railroad such as noise, cinders, smoke and dust have existed in front of these residences for the many years during which this very railroad has been operating through the town on its present roadbed. These personal inconveniences are not factors entering into the *public service* which the Public Service Commission must consider on this record.

This case has in it the question of a direct and undue burden on interstate commerce and transportation by the slowing up of passenger trains, and the added expense of operating and maintaining extra freight trains which would result from an increase of the grade, especially to 0.40 per cent. as asked by town authorities.

But because the Court is of the opinion that the standard for the grade is a detail committed to the management of the railroad, and which is not subject to restriction by the Public Service Commission, an order or decree will be signed dismissing the bill of complaint of the town of Port Deposit and granting the prayers of the bill of complaint of the Philadelphia, Baltimore and Washington Railroad Company.